BARNETTE, Judge.
This is an appeal by the plaintiffs, husband and wife, from a judgment in their favor awarding the husband $1,208.56, as special damages, and the wife $4,000 for personal injuries sustained in an automobile accident. They have appealed seeking an increase of quantum in each award. The defendants did not appeal nor answer the appeal, and there is no issue before us except that of quantum.
The plaintiff Mrs. Bertha M. Collins was injured and the community-owned automobile damaged, when the Collins automobile was struck from the rear by an automobile driven by defendant Warren L. Schulz and insured by Liberty Mutual Insurance Company. Mrs. Collins sustained an injury to her back, causing pain and disability, which she asserts will be permanent. She contends that the allowance of $4,000 for pain and suffering is grossly inadequate. Mr. Collins, as head of the community, was awarded special damages for repair of the automobile;[1] drugs; hospital and medical expenses; for therapeutic devices purchased; and $315 for expenses of hiring a servant to assist Mrs. Collins during a period of alleged disability.[2] By this appeal he seeks an additional $1,395 for servant hire to the date of trial and $3,900 anticipated future servant expenses. He also seeks $150 for golf club dues paid for Mrs. Collins from which she allegedly derived no benefit on account of disability to play golf; $100 for cab fares and miscellaneous expenses; loss of earnings of Mrs. Collins, past and future, totaling $17,554.90; and $5,000 additional for anticipated future medical expenses. Defendants have accepted as reasonable the items of special damage included in the judgment below, but oppose the additional items claimed by Mr. Collins.
*305 The accident in which Mrs. Collins was injured occurred on October 20, 1963, at about 5:00 p. m. She did not experience severe pain until about 10:30 that evening, when she attempted to get up from the divan in her living room to prepare for bed. On October 22, she attempted to contact Dr. Robert M. Rose, an orthopedic surgeon, but it was the next day before she reached him. By telephone, he advised bed rest and heat applications; and on October 25, when he first saw her after the accident, he prescribed muscle relaxants, pain relieving pills, and tranquilizers.
Dr. Rose had treated Mrs. Collins in 1952, 1957, 1958, 1960, and 1963 for fractures and sprains to her arms and ankles. The treatment in 1957 was for pain in the lumbar region, experienced after pushing an automobile. Dr. Rose, therefore, was well acquainted with Mrs. Collins and her medical history.
Dr. Rose testified concerning his examination on October 25 as follows:
“ * * * She complained of pain radiating around to the right side. Examination showed that she had an increase in the dorsal kyphosis curve of her back, and there was slight involuntary muscle spasm of the chorocal [sic] lumbar vertebra; spine bending was limited in all directions; there was tenderness on pressure in the right costal vertebral angle with pain radiating around to the right side. There was no tenderness on abdominal pressure. Actual leg lengths were equal, and straight-leg raising was normal. Both patella and both Achilles reflexes were normal. * * *
“X-rays were made by Robyn Hardy on October 25th, 1963, and were reported as follows: ‘Thoracic and lumbosacral spine — the bones are intact, and no fractures or destructive process is identified involving them; none of the pedacles [sic] have been destroyed; the bones are generally osteoporotic, exhibiting some degenerative changes. Kyphosis is noted within the thoracic area. * * * ”
He said the X rays showed evidence of arthritic spurs, though they were not large or prominent. There were advanced osteo-articular findings present in the “lowermost zygoapotical [sic] joint” (which we assume relates to the zygapophysis, defined as one of the articular processes of the neural arch of a vertebra) on the left side, described as the joint between the lumbar and sacral areas of the back.
The witness testified further:
“ * * * All of the lumbar interverte-bral discs are norrowed [sic], and this is particularly true of the sacroiliac joint; and the sacroiliac articulations are clear; and no other findings are noted’. I checked these X-rays, and I agree with Dr. Hardy’s report on them. * * *
“My impression was that Mrs. Collins had some severe degerative [sic] changes in her spine, with a dorsal kyphosis; and I felt that the pain of which she was complaining at that time was most probably on the basis of activation of her spine from the accident she mentioned. I prescribed mild relaxants and pills for pain, and she began later wearing a corset, and had been applying moist heat at home.
“I re-examined Mrs. Collins at my office on November 6th, November 18th, and December 13th, 1963 and on January 17th, 1964.
“Mrs. Collins was re-examined at Dr. Hardy’s office December 28th, 1963, and a copy of the report of the second X-rays were attached. They showed no significant changes over the previous X-rays.”
Mrs. Collins was an avid golfer and regularly played five or six times a week until the discomfort of her back forced a sharp curtailment of this activity. Intermittent back pains persisted; and she was examined again by Dr. Rose on May 11, 1964, and again X rays were made by Dr. Hardy. *306 No significant changes were noted, but there was an increase in the dorsal kyphosis.
In September, 1964, Mrs. Collins reported to Dr. Rose that her back pain had recurred in playing golf. His examination that day indicated lumbosacral pain radiating into the posterior aspect of the right hip and leg. There was some involuntary spasm of the paravertebral lumbar muscles. Leg raising tests and reflexes were normal. He considered the possibility of pressure on the sciatic nerve roots from a degenerating or herniating vertebral disc and performed a myelogram on November 9. He stated:
“The myelogram showed what I interpreted as a ‘bulging of the L-4 disc’ and I presume that it is the disintegration or degeneration of this disc with the accompanying bulge which is responsible for the back and occasional back leg pain which she experiences. I do not believe that surgery on her back is indicated at this time. Should her symptoms increase or progress, it is possible that surgery may be required at some time in the future.”
He further testified:
“ * * * I summarized in this report [January 13, 1965] that Mrs. Collins’ back pain had been symptomatic since her injury of October, 1963; and whereas the X-ray evidence of degenerative changes and of kyphosis were apparent prior to that time, Mrs. Collins was unable to pursue her normal activities and play golf. And since she was a rather consistent golf player, this is rather unfortunate to her.”
Dr. Rose’s last examination was on November 8, 1965, at which time she complained of trying to “play golf several times each week, but could not play on two successive days.” She continued to experience recurrent pain. He stated that the degenerative arthritic changes were more evident on the left side, and since she complained more of pain on the right side, he considered the possibility of some pathology not shown on the X ray and that is why the myelogram was done. He testified:
“A. The reason for the bulging being more apparent on the Myelogram at the ‘L-4’ space is because this is the space which is degenerated; and basically, this is the space which is causing her back pain; and although she does have arthritic changes and narrowing of the fifth (5th) space this is not the prime factor in her present back complaint or trouble.
“Q. Doctor, would a trauma cause this?
“A. Trauma is a common cause of this breakdown.
“Q. From the accident Mrs. Collins related to you, could that be the cause of the bulging at ‘L-4’?
“A. I believe it could conceivably be the cause.”
He agreed, however, that any twisting movement, as in playing golf, bending, stooping, etc., could be a cause of the pain described; but he thought her discomfort was due to injury of the fourth lumbar disc.
The other medical expert was Dr. Rufus H. Alldredge, an orthopedic surgeon, called as a witness by defendants. Mrs. Collins was first examined at the office of Dr. Alldredge by his associate, Dr. Ray J. Had-dad, on April 17, 1964, six months after the automobile accident, and again in September, 1964, and on February 17, 1965. Dr. Alldredge had the benefit of Dr. Rose’s reports and Dr. Hardy’s X-ray reports.
Dr. Alldredge testified concerning the first examination and the X rays as follows:
“A. X-rays were taken of the upper spine, or dorsal spine, and the lum-bosacral spine, pelvis and hips. These revealed degenerating arthritic changes throughout, with some *307 narrowing of the intervertebral disc spaces in the lumbar area.
“She had a kyphosis in the dorsal spine. There was narrowing, particularly of the lumbar interverte-bral spaces, and at the lumbosacral j oint.
“Q. Doctor, what is the significance of the narrowing of the lumbar inter-vertebral spaces?
“A. Well, it means that — well, of course these changes were related to or of long standing and undoubtedly preexisted the injury she had; and it simply means that she had had a diseased and degenerated spine for years before this happened. Actually, there are some arthritic changes in the dorsal region too. These are changes due to age and poor posture and the arthritis that would be developed by people in this age group, and it will show on the X-ray.
“Q. Doctor, what was your impression at that time?
“A. My impression is that this patient has a degerative [sic] arthritis and has sustained a lumbosacral and lower dorsal paravertebral muscle strain at the time of her injury. Severe degenerative changes are present in the dorsal and lumbar spine and involve the lumbrosacral joint.
“Q. What was your opinion after examination ?
“A. I feel that the patient should progress satisfactorily with time, although rather slowly as she is doing at the present time. I do not feel that any active treatment is indicated at this time, and feel that her prognosis for her return to her pre-injury status is good — probably within the next two (2) or three (3) months.
“Q. Doctor, is there anything in this report which is indicative of a ruptured intervertebral disc?
“A. No.”
Relative to the examination of September, 1964, he stated:
“A. She stated she has periods of time, such as eight (8) or ten (10) days, when she feels perfectly normal in every way and has no pain or discomfort whatever; and then she is-subject to having recurrences of pain in the lower back once in a while, especially after playing golf. She went on and gave a history of having played golf some time last July and after this she developed' acute, severe, disabling pain and went to bed for a time and walked' about somewhat stopped over for a few days after this. Apparently she did not consult Dr. Rose or have any treatment at that time, as she stated the last time she had seen him was ‘about last June’.
* * * * * *
“A. * * * She stands with normal' poor posture — normal for her, that was — rather marked dorsal round back with marked lumbar lardosis and so-called ‘sway back’; which is. normal for her and has been present for many years. The back motions, on standing, however, are within normal limits, and she can nearly touch the * * * when standing flat-footed with the knees straight. Her bending motions were within normal limits; and she complained of a little discomfort when bending to the right. Straight leg raising was normal on both sides, and there was no evidence of sciatica.
******
“Q. Doctor, what was your opinion, based upon the history and your examination ?
*308 “A. At this time the symptoms complained of are subjective in nature. There is nothing abnormal to be found on examination — that is, from an objective standpoint; and as far as I can see as a result of this examination, she has attained maximum benefit from time and treatment and has essentially recovered from the symptoms complained of following the automobile accident.
******
“Q. At the time of your examination on February 17th, 1965, did you find any clinical evidence of a ruptured intervertebral disc?
“A. No; I did not.”
When questioned concerning his review of the myelogram studies, he said:
“ * * * I had a strong opinion that she did not have a so-called ruptured disc of the type that requires surgery of a ruptured disc, of any kind for that matter. She may have had what we call a 'bulging’ disc, but then arthritic changes in the spine can cause a myelogram to show so-called 'bulging’ at the disc level when it is not due to the disc at all, as we all well know.
“It was my opinion that she did not need surgery at this time, and that she most probably never would.”
He further testified:
"Q. Doctor, based upon the history which you obtained from the plaintiff, Mrs. Collins, and your examination, would you express an opinion as to whether or not, with reasonable medical certainty, Mrs. Collins’ condition is the result of an automobile accident of October, ■ 1963?
“A. Well, as I have said, basically she has a pre-existing diseased spine. It would be difficult to imagine anybody with a spine like she had at the time of the accident not having had any previous pain.
“Secondly, we certainly know— and all the doctors as well as the lawyers probably know that it is unusual for a person to complain following a rear end collision, to be injured in the lower part of the back or the middle of the back without having some sort of neck injury. We would expect a pain in the neck first and foremost, and then some back injury; but beyond that she did not say — and I cannot say, she had at the time; the history is all I have to go by, and I could not give any final positive opinion that her condition is the result of an accident or is not.”
The medical testimony is quite lengthy and in great detail. We have reviewed above that portion which we believe to be most significant and which, we think, supports the conclusion reached by the trial judge, who said:
“The Court is of the opinion that Mrs. Collins suffered an aggravation of an existing condition with very painful results. She had been treated for severe arthritic degenerative changes of the spine by Dr. Rose. It is very difficult to tell what discomfort she would have had if she had not had the accident, but from the evidence the Court concludes that she suffered severe pain initially, then lessening to gradual, intermittent discomfort over a period of a year and one-half. The same is true to some degree of the medical expenses, and the Court concludes that they are recoverable. The Court is of the opinion that her present condition is the result of her illness and not the result of the collision. The Court concludes that an award of $4,000.00 is proper in the premises.”
There is no manifest error apparent to us and we concur in this conclusion.
*309 The award of $4,000 for pam and suffering is in line with awards made for similar injuries in many cases. We can find no abuse of the much discretion vested in the trial judge in making this award. Ballard v. National Indem. Co., 246 La. 963, 169 So.2d 64 (1964); Gaspard v. LeMaire, 245 La. 239, 158 So.2d 149 (1963).
After awarding the special damages above enumerated, the trial judge held there was insufficient proof of the other items. We agree that the evidence does not support the additional claims of Mr. Collins, which, in the main, are predicated upon anticipated future expenses. For the reasons stated above, it is our opinion that Mrs. Collins’ continuing pain and forced limitation of activities are not so much the result of the accident of October 20, 1963, as they are the result of the degenerative condition and arthritic changes taking place in her back from natural causes apart from any injury she may have sustained.
We agree with the trial judge that there was an aggravation of the preexisting conditions with painful results. However, we think much of her continued discomfort results from the strenuous activities, particularly golf playing, which Mrs. Collins apparently is unwilling to give up. Both Dr. Rose and Dr. Alldredge testified that Mrs. Collins reported new episodes of pain 'brought on by playing golf. This is particularly significant in the light of the medi•cal testimony that stooping, bending, and twisting of the body can bring on the condition complained of. Dr. Alldredge did not think there was a causative connection with the automobile accident, and Dr. Rose only said that the trauma of the automobile ac■cident was a “conceivable” cause.
 The award of the special damages -for additional servant hire for 21 weeks appears to have been adequate to cover the period of disability brought on by the aggravation of her preexisting condition. Future servant hire and treatment are too remote causally and speculatively to justify a special award.
Mrs. Collins is a tax consultant and conducts her own business with apparent success. Her alleged loss of income prior to trial was not established by reasonable proof. Her alleged future loss of earnings are entirely speculative and too remote in causal connection with the accident of October 20, 1963, and were properly rejected by the trial court.
Therefore, the judgment in favor of Daniel J. Collins is amended to increase the award of $35.87 for automobile repairs to $135.87. This makes the total judgment in favor of Mr. Collins $1,308.56. The judgment in favor of Mrs. Bertha M. Collins in the sum of $4,000 is affirmed, and as amended, the entire judgment is affirmed at appellants’ cost.
Amended and affirmed.

. An item of $35.87 for automobile repair included in tlie judgment below is conceded to be in error and should have been $135.87.

. This item of expense was computed on the basis of three additional days of servant hire a week for 21 weeks at $5.00 per day.